Night Circuit, thank you all for being here. We have a few cases that are submitted on the briefs today. Rosa Gonzalez v. Bondi, 23-3564. United States v. Orduna, 24-7565. Hill v. Bricegnano, 25-1060. United States v. Pritchard, 25-129. And Lovelady v. Experian, 25-2720. Oh, and also Amadeus Therapy v. Amadeus Therapy, 25-3867. All of those cases are submitted. The other cases will be heard in the order in which they appear on the calendar. The first is ERC Today v. McInelly, 25-2642. Each side has 10 minutes. May it please the court, good morning, Your Honors. My name is Peter Arhangelsky on behalf of the appellants, Stenson-Tamidon, ERC Today. I'd like to try to hang on to maybe upwards of three minutes of my time for rebuttal, if that's okay. Your Honors, this case challenges the IRS's material change in procedure for handling tax refund claims under the Employee Retention Tax Credit. The IRS created a first-of-its-kind program that automates refund decisions using eligibility filters developed without first gathering facts needed to evaluate eligibility under the ERC statute. Those automated decisions start the two-year statutory window for taxpayers to resolve their claims at the administrative level and prevents meaningful administrative appeals when the IRS diverts these claims into post-denial audits. My understanding of the history of this was a program developed during COVID in the aftermath of COVID to help employers retain employees is that some pretty substantial fraud was discovered early into the program. Am I right about that? The IRS has made public statements indicating that fraud was identified by practitioners in the space, but there's been precious little data revealed regarding what level of fraud within the program might exist. They discovered that businesses claiming the credit didn't exist and that businesses that did exist claiming the credit had no employees, right? So what's wrong with the government developing an audit system to ferret that sort of thing out? Because that's not the kind of auditing that we're talking about in this instance. The auditing that you're speaking of that did occur at various times, including in December of 23, and there are certain types of practices that they use to identify information which they would have had in their files. What we're talking about here are the rules that animate this program. These are going to the eligibility criteria under the statute itself. So if you look at Section 3134C2, you have various ways in which a business can qualify. One of those would be, let's say, gross receipts decline. Another might be a partial suspension by a government order. The IRS never collected the information from the taxpayers. But aren't all decisions made at the IRS about eligibility, whether I'm eligible for a charitable contribution or for daycare or for credit because I'm a veteran or because I'm blind? Those are all eligibility questions. Isn't that everything that the IRS deals with? I think that's fair, but I think what we're talking about in this case is how the IRS is dealing with it and whether the IRS has what it needs to be able to make those decisions in the first instance. So the district court dismissed this on standing. So let me take you to the, let's talk about, first, I'd like to talk about the question of injury, in fact, and I want to see how far your theory goes. Because your clients are not filing with the IRS. That is, they're not filing as principals with the IRS. They're advisors to clients, and their business model is we get paid when you get paid. Under your theory, could ERC's employees file this suit because they won't get paid their salaries unless their clients get paid? Well, I think the distinguishing position here is that as tax preparers, they are regulated by the IRS in this capacity, and they're required to follow the regulations and the processes. Sure, but that would describe all CPAs, all tax preparers. But I'm trying to figure out about injury, in fact, couldn't their employees have brought this suit and say, yeah, if ERC doesn't get paid, we don't get paid. And therefore, there's injury, in fact, we can trace the causation in the same way that ERC can, and you claim the same redressability. Well, I think the employees in this instance are another layer removed from the direct harm. Well, they are a layer removed, but you're a layer removed. Now, do I get one more layer removed? What about ERC's landlord? Can the ERC's landlord come in and say, if ERC's told us that it's going to be a crunch time because things are being delayed at the IRS, and if they don't get paid, they may not make rent. So can the landlord, yes, it's one more step removed, but tell me how many steps removed we get? Well, I think there are prudential considerations under the APA for a claim like this where a party has to be within the zone of regulation. And I mean, the tax preparers, they definitely are in that situation. When you get down the line and you talk about these attenuated parties, they're not contracted directly with the clients like our clients are. They haven't entered into agreements. In this case, like Sense and Tamadan or ESG Today have entered into contracts that require them to assist the clients throughout the administrative process from day one through to when they can secure the credit. So can I ask, your theory of injury is, as you're just describing, it's your clients' either costs for these representations or the money they get from these representations. Have you shown anywhere in the record that you're actually worse off under DDP in terms of your finances than you were before? Well, in terms of finances, I think the answer would be obviously yes, because they've been denied the credit that they would otherwise have had an opportunity to secure beforehand. But have you shown aggregate numbers at all or percentages of your clients because, sorry, of your clients' clients? Because some people were denied before also. I couldn't figure out anywhere where you're actually showing that, alleging any sort of numbers other than just like this client was denied or that people would be denied. I don't want to speak out of turn on this. I believe the declaration of Eric Stenson mentioned the volume of denials that were at issue. I'm not 100% certain on that. But obviously, Sense and Tamadan has suffered hundreds of disallowances through this program. But unless you can show us that whatever those hundreds are, are a higher percentage than it was before, I don't see how you've shown an injury from this program. Well, the higher percentage, I mean, we're also looking here at a, it's a procedural case in many respects. And so we're suffering a procedural harm that makes it more difficult for Sense and Tamadan to obtain the relief for their clients. But that only matters for you if it translates to money, right? So you need to show then that the procedures under DDP cost more overall per client, per client's client, the underlying person or company applying for this refund. For each client's client, you need to show some kind of worst thing for your client, either in the expenses or the earnings. And just saying we have to do a lot of things doesn't show us you didn't have to do a lot of things before. Just saying someone was denied doesn't show us that someone wasn't denied before. You're not actually, as I understand it, alleging really, I mean, for your standing, it doesn't depend on the merits of a particular denial because you don't care about that. You care about the aggregate. And I don't see anything about the aggregate in your allegations. Well, because I disagree that it's just based on money. And I think, like I mentioned, we have a procedural harm that suffered when we lose some of the elements that we'd normally have in a pre-disallowance audit. Now we have different, you know, we have a shifting burden in a post-disallowance audit. We have the time crunch that's the press of the lack of administrative appellate process, the forced entry into civil litigation, which deprives my client of an ability to actually resolve that in the administrative forum. We're not lawyers. They're not lawyers. But so as the tax preparer, you're saying that your injury, in fact, is stress? Well, I think it's a change in legal burden. I mean, this is something that we've accepted for many times over. I mean, there are different cases that have looked at the change in, let's say, for example, the addition of an affirmative defense in an eviction proceeding. There's different types of ways in which you can burden a proceeding, which is the trifle that's required for injury under Article III. I mean, and that's what we have here. You have a fundamental change procedure. You've shifted these claims from being pending to outright denied. Say we accept that. Where's the harm? Well, the harm is that our clients have to have, I mean, even on just day one, our clients have to have conversations with serious strategic decisions as to whether they want to even participate in an administrative process at this point. Because they know that there's at this point almost a near certainty that they cannot go all the way through. So you can have a post-denial audit, but it's unlikely that even if you come out the other side of that and you maybe, let's say, have some disputes with the IRS over, you know, a squishy issue like partial suspension, now you don't have the administrative forum that you're back to be able to resolve these issues and fully mature a record for district court litigation. I mean, these are serious procedural harms at this point. And I think it's cavalier to suggest— Your procedural harm, the causation here requires two steps. So one is the initial disallowance, that is the filters that seem to be filtering out more cases, though the IRS is more cautious in what it's allowing. And the second is a declination on the part of a client to pursue their administrative remedies. Why isn't that sort of an intervening cause that's not the IRS's responsibility? Well, I mean, for standing purposes, none of the precedent's a predictable outcome, the way a third party might react. And I think we've definitely seen that courts have accepted that in the past. I mean, it's just—the reality of a post-disallowance burden is that it is more intense. It's broader. And many times the IRS is going to not just audit the disallowed quarters, but they're going to audit all the other quarters that were paid as well. I mean, it is—I think it's—and I mentioned the presumption of correctness that attaches to the disallowance as you move through. So, I mean, it is definitely an increase in burden. Now, if you ask me to put a dollar sign on that, I think it's difficult because, you know, one of the features of the case is that we've filed a lawsuit to restrain what we perceive to be an unlawful practice, likely before, you know, many of these files played out in the system. So it's hard for us to literally look at this and say and run that type of regression analysis, you know, at the start of the case. I mean, that would be something we obviously could do at the district court level. But on this frozen record, we can't. But I can tell you that it's unquestionably more burdensome on the part of a tax preparer, who, by the way, is the lead in their interacting force with the agency. The tax preparer is the party that has to carry the burden through. And obviously, you know, I see them over my time, but yes. As long as we're still asking questions, you can keep going and I'll give you a bit of time for rebuttal. But I'm just wondering how many of your clients' clients' claims are even still pending? Is there a mootness problem in this case? No, there's and again, I mean, I don't know, I can I can make this representation from the podium. But I will tell you that out of the thousands of parties that have actually made it to a protest, our client has a very significant percentage of those. I think at the time at the district court, it was we were over 10% of those. I know that probably, let's say 200 or so were pending. We had about 100 potentially resolve at the agency level, but there still are hundreds that are pending at the administrative level. And we've even had to put some of those cases into civil refund suits at this point. So litigation is beginning and that's the outcome here. Are you seeking to undo the pending ones or just change the process for when a new claim is filed? Well, I think prospectively and yes, and I think to this point, we do have pending claims that are still have not been acted upon by the agency. And we are looking for prospective injunctive relief. That is, of course, what we want. But I think in order, if you're looking at preliminary injunctive relief, in order to rewind the procedural injury, you either have to require the IRS to extend the statute of limitations for filing a civil refund suit or you have to put it back before the time of the DDP program so that they have an opportunity to present their evidence to the agency before a denial. So I'm not sure you can answer this question, but curiosity really has gotten the best of me. And that is, why didn't you just file this suit on behalf of the clients rather than filing on behalf of the preparers? Well, I think one of the concerns is that I don't think we can. I mean, if you look at I guess I would direct you to Cohen v. United States, which is a D.C. Circuit decision from 2011, which is an en banc decision, which actually deals with a refund mechanism for taxes. And the court in that case was very clear that a Section 7422 action would be inadequate. One of the reasons is because prospective injunctive relief isn't available. So I mean, those cases are solely about money. And it's just about a specific claim. Was this specific client eligible? And can we can we award money for that? So you can't But you've got a systematic challenge. It's not a challenge to any particular refund. It would be it would be a challenge based on the fact that you have a whole series of people who are who are applicants for for refunds who have been who've been denied relief. They've been filtered out by the system. Right. So even in a taxpayer case, I think it's important to recognize that that style of claim still has to be presented as an APA theory. I mean, it's not going to come in as a taxpayer refund suit. It's going to be an attached and joint claim. But the question is, it seems to me that would solve your standing problem. Well, I don't think we have a standing problem. But also beyond that, I mean, it's relevant. You should know that the Department of Justice is advancing argument in these cases around the country, saying that taxpayers lack standing to pursue APA litigation in these to challenge things like the Notice 21-20 and other features of the case. So it seems to me that a class that a class action based on the kind of procedural harm that you that you've described here might stand on might might present a very more compelling case, let's say, for for class relief than than than an individual taxpayer case. Assuming you could meet the elements of a Rule 23 class. And I'll tell you, I mean, if you want to write the order for us to say that a class can proceed, then we'll have that case filed. But the reality is, I don't think that a Rule 23 action is an appropriate means because if it depends on what you're talking about, you're filing, are you filing it under in an APA sense, and then you're going to confront very similar issues. If you're filing it as a tax refund case, then you have a problem with prospective injunctive relief. And it's still the same APA limitations that we're talking about in this case. So if we think you have a standing problem here, that in the current posture goes to the injunctive, the preliminary injunctive relief, but not to whether this case gets dismissed. Am I understanding the procedural posture correctly? Like the district court didn't dismiss after finding there was no standing. So it's a bit of an odd situation. This case is still going regardless of whether we say there's no jurisdiction. What's happening right now? Well, we agreed, I think, with with opposing counsel that the it was more or less like a 12 v. 6 issue on standing issues. And so it's where we stayed the case at the at the district court level to resolve these questions. But again, I mean, there was no question on injury, in fact. But what we have before us isn't an appeal of dismissal of the case. It's an appeal of the denial of preliminary injunctive relief. Right. So if we were to say, correct, there's no standing, would you try to amend like if you just hypothetically, I don't know if my colleagues would agree, but if if I'm not persuaded that you've shown that there's actually an injury to your clients because of this financial comparison, maybe you could add to the record and or add to your allegations, depending on whether we're talking about evidence or the pleading and fix that maybe. But we're not even really in a remand for leave to amend because we're not we're talking about the P.I. So I'm a little confused. Like what what would you want if we think you don't have standing right now? Well, I would at a minimum, I would ask for the opportunity to amend at the district court level because and I think we would have that right. We because, yes, we probably could add facts that would cure standing, including some of the facts that you just questioned me about. I don't know that those are necessary, but we could. But we we're not really in the kind of remand for leave to amend posture right now, are we? No, we're asking, I think, for review of the of the limited decision of district court, which in this case was an opinion on addressability and also final agency action. We've we've appealed that we have asked for relief on a preliminary injunction motion. But at a minimum, we are asking the court to reverse and send to the district court with instructions for the case to at least continue on the merits. Redressability is part of standing, right? It is. I don't have any. You'll still have two minutes for rebuttal, but let's hear from the other side. Good morning, your honors. May it please the court. My name is Nishant Kumar and I represent the government appellees in this case. I would like to just actually address a few things that came up in the in my friend's presentation. Speaking exactly to the standing, we see two problems here. One is that the lower court found, as a matter of fact, that it was speculative rather than likely that even if you put the high risk disallowed claims that Stentum is pointing to through a full examination before disallowing them, they said it was speculative rather than likely that any there would be any different outcome. Because after all, we're dealing with claims that bear the facial indicia being, you know, ineligible. I think the other side's argument back to that, though, is that that's assuming the merits. It assumes you win on the merits on the idea that this algorithm is a good algorithm. Yes, but I guess it also, so if it's not, so one thing I just want to say is if we treat, though, as a factual conclusion, the district court's finding that they didn't show any of any concrete instance in which a disallowance led to an eligible claim being improperly disallowed, then they didn't make the clear showing that anything would be different under their preferred process. I mean, what's odd about this representing their client still has another client? The odd thing is I'm not sure the merits of the second order client, the actual claimant, matter. For their client, the preparer, all that matters are aggregate numbers, like whether it's a good denial or a bad denial. They just care about whether they're making money or not. Well, let me get to, so the second independent problem, I was going to say let's spot, we could spot them contrary to what the district court found, that let's say they even shown, maybe they can't make a showing in the aggregate, but they've shown a scattering of instances in which disallowances based on risking happened for clearly eligible claims. And it seems like they have alleged that. I mean, there's at least, I think there's a central site client that they mentioned. Let's just spot them that they've shown that that was clearly eligible but disallowed because of risking. The next question is, so what? Because even the risking-based disallowances allow for vindication of actually eligible claims later on, right? So the question becomes, is there any proof, and there's not, that the clients who are disallowed based on risking, it cost them more to vindicate their claim in the process as in place now versus the process that Stentim would prefer, and there's not a shred of evidence. And that's what my questions were getting at. That's my reading of the current record. I can't figure out any numbers that would allow such a comparison. But so what do we do with this odd procedural posture then? I mean, if we agree with that, what do we say? Because it actually does seem like something, if we were at a motion to dismiss stage, we could say, I mean, that would be something that could be amended, whether they actually can, I have no idea, but at least in theory they could amend. But we're not really at a leave to amend stage, right? Where are we at this point? So my understanding is, if you affirmed the decision below, yes, it would go back to the district court, and there's still a theoretical possibility because the case hasn't been dismissed, and because the showing was slightly different based on, you know, they had to make a clear showing of the standards, Article III standards versus a lesser showing if they were just seeking to carry on with their litigation short of an injunction. The case would go back. Maybe they could seek leave to amend. I don't know if there would be something in the district court rules that would foreclose that. I imagine the government would file a motion to outright dismiss the case and raise some of the APA problems, the sovereign immunity waivers, like no final agency action or no APA review where there's a specialized judicial review under the tax code. The court has not, as a formal matter, like, decided those. It's only technically, I think, decided. There's not a likelihood of them being able to show that, but you could just recycle the same arguments, I think, on a 12b-6, and that would then lead to a final dismissal. Do you think that the final agency action issue is a jurisdictional issue or a merits issue? I think it's a jurisdictional issue because I think it goes to whether the government has waived sovereign immunity to the action. Sovereign immunity is a jurisdictional issue. So that issue, in theory, could be decided before standing, on your view. Yes, yes. So that could be an entirely... Why isn't sovereign immunity a claim processing rule rather than jurisdiction? The section in the APA doesn't refer at all to jurisdiction. Our cases, by the way, I think have gone both ways on this question. On whether sovereign immunity is jurisdictional... Whether it's a 12b-1 or a 12b-6. It may be a very, very firm 12b-6, akin to a 12b-1, but I'm curious about whether sovereign immunity really is jurisdictional or whether it's... If the government invokes sovereign immunity, that would be one thing. Sovereign immunity can also be waived. So if the government... Your Honor, I couldn't presume to add clarity from the podium to the question of whether sovereign immunity is jurisdictional or not. We just have pointed to the Ninth Circuit cases holding it was. If it's not jurisdictional and district court decides it's not jurisdictional, then I guess it would impact the order in which the district court would have to potentially allow amendments so that they could do another standing analysis before getting to why the APA doesn't waive the sovereign immunity of the government in this case. I want to take you back to something that you said. You said that there was no proof that the clients were spending more under the filtering than before. So I want to push back on that just a little bit. Wasn't that the whole purpose of the filtering was to deny more claims, a larger percentage of claims, because you thought that you were overpaying the refunds? I'm just wondering, how much evidence do we have to have that was exactly what you were trying to do? Right. No, but I think the question isn't whether more claims were disallowed or not. The question... And obviously, if Stentum has a claim that was disallowed as a result... One of its clients' claims was disallowed as a result of risking, obviously in the counterfactual, if that claim were allowed, wouldn't Stentum be in a better position? The answer is yes. But that's not really the question here, because their beef is with the order of operations here. As they mentioned, it's just a procedural problem. The problem is whether the claims disallowed by risking, have they shown that it costs them any more to vindicate those incorrectly disallowed claims that are through the process in place right now, versus what their proposal is, is you must have a pre-disallowance full-bore examination of even the most facially risky claims, right? Because that's the only ones that are disallowed in the first place. That's the only thing this risking program's really impacting. And they're saying, even for the riskiest claims, we want a full-scale examination before you can issue a disallowance. The question is, how is that going to save Stentum money in representing their clients before the IRS? And there's not a single piece of evidence in the record that somehow that would be less costly. There's a part in their brief on page 8 of their reply brief where they complain about, quote, the unreimbursed cost of collecting documents, preparing responses to the IRS questions, and justifying eligibility. The question is, if you want pre-disallowance examinations of the IRS by these high-risk claims, aren't you going to have to collect documents, prepare responses, and justify eligibility in a quite thorough examination that's happening prior to the disallowance? So what's the cost differential to you, to know, page 24 of their reply brief, I think, is where they most squarely try to contend with this. What's it to you if we switch the order in which the process is happening? Give us some dollars and cents, and they don't. There's not a single record site in that section of their discussion, page 24 of their reply brief. The only difference they've pointed to is this theoretical difference where you've got this two-year deadline for filing a refund suit from the time of disallowance, and they've pointed out that that kind of hinges on the time of disallowance. So when you get a disallowance at the very front end, and then you pursue an appeals that often gets routed back through an examination, you're eating into this two years in a way you would not have under their preferred process. But the question again is, there's already in the statute, in the code 6532, 26 U.S.C. 6532, there's a provision that allows IRS appeals, or IRS to extend this two-year deadline, for one, and they just haven't shown that any client has actually run up, they haven't shown a concrete instance in which a client has run up against the two-year deadline, and therefore been forced to abandon a claim, you know, that they were just on the verge of vindicating it in the administrative posture, and now they have to go to a refund claim. Can I ask a question? I want to get back to final agency action for a moment. Imagine that we learn that this DDP algorithm is based on the political registration of the claimant. So it's denying all Republicans and granting all Democrats, or vice versa. That's the algorithm. Do you really think someone couldn't sue about that, or say it's denying red states and granting blue states? You don't think a red state attorney general could sue about this and say it's final agency action to adopt that algorithm? I have trouble understanding how there isn't a possibility that an algorithm is, the adoption of an algorithm is so improper that you couldn't sue over it. Got it, Your Honor. And can I just, I promise I will get to that, but I also just at one point wanted to address their allegations that the risking is somehow completely arbitrary and unmoored from the actual eligibility of the claims. And we see that as about as, like, misguided as saying when a court takes a look at the likelihood of the merits, it's finding it's completely arbitrary with regard to the actual merits. Well, I think that answer goes sort of to my question. You're trying to get us to believe that the algorithm is good, and maybe it is good. And if it's good, you probably should win on the merits. But the algorithm is secret right now. And so what I'm getting at is there could be an algorithm that would be very improper, and it would seem like the adoption of such an algorithm would be an action that someone should be able to do something about. Sure. So I'll handle that first, and then I'll go back to, I'd like to make clear what the risking is based on. Because while we don't know the specific parameters of it, we know some of the criteria that go into it. And it's not, you know, whether your last name starts with one letter as opposed to another, red state, blue state. As a matter of final agency action, whether it's good or bad on the merits, I don't really see how that should be the answer. It's like the category of things should be final or not. And it feels to me like this is final. So I think it's still a little ways away from, I think the easiest way maybe to see it is to compare it to the cases they've cited, Scholl in their opening brief, and Multnomah in their reply brief, about if there was these, if the criteria were really binary, and it was like, if you are this, you will be disallowed. If you are this, you will be disallowed. If you are this, you will be disallowed. And yet, there was just a black box as to what those, the criteria were undisclosed, but the nature of them was, if you could only lift the veil, you would see a very clear cut. You could compare a credit claim and just the now disclosed criteria and be able to tell, well, you don't have to submit a claim to know that if, like in Scholl, the Scholl case, if you're in... Isn't that the situation? I don't know that that's the situation. But okay, so by keeping it secret, how can the agency prevent something from being a final agency action by just keeping the action secret? That seems completely backward, because I mean, then nothing can ever be challenged. You just keep everything secret. That doesn't sound like a very democratic approach. So Your Honor, I'll say, I guess what we know of the program is that it applies some sort of risk score to criteria, which I assumed was not a binary. Like, there are dispositive disqualifiers, but then there's also probably factors which are somehow risked. And if you have an accumulation of these factors that hits a certain threshold, you know, your claim is sorted into a certain bucket. But before applying the program, you can't really tell what an individual claim, like, what the outcome would be of risking that claim in the way that you could tell in your hypo, what the outcome would be. I mean, is that just a complicated way of saying it's AI or a complicated way of saying it's secret? I mean, I think going back to the question, why shouldn't that approach be the choice to adopt such an approach that is going to deny certain people something that could be challenged as a final agency action? So I think, you know, if, if, like, once you concede that, that if it was binary, it would be, I just don't understand the difference. I mean, I think it's, if we knew for sure it was binary, I agree. I couldn't say, you know, you have to question as to whether it's binary. That goes, that's a merits question. That's going to be whether it's arbitrary and capricious. But Judge Friedland's questions are really, is a really good, what more, what more does the agency have to do to make this final? I mean, you, I guess you could hold a notice and comment hearing as to whether, as to whether you should do all of this, but you didn't do that. I'm not sure the IRS has to do that, but, but I also don't think that if it chooses not to proceed in a formal rulemaking to say, this is the way we're going to handle these claims, that it now gets to claim, well, it's not final. What, what's not final here? What, what, what does the agency still got under consideration that would, that would be interfered with if there were court review of what it's doing? So I guess, you know, maybe we can't hang our hat on it being, it not being final agency action, though I suppose it's worth mentioning that when we're talking sovereign immunity and whether this claim, APA claim can be brought. So surviving the final agency action thing is just one hurdle. There's also the, the problem for them that the tax code provides its specialized channel for judicial review. Those are, those are all really good arguments and we're just not close to them yet. Right. But then the, yes. And that one, that second one is sort of a sea clamors type of thing. That's, that's, that's not jurisdictional, right? I can't speak to sea clamors. I mean, it's just the idea that there is some other kind of claim other than the, than the one like that you shouldn't bring, because there is a specific kind of claim, you can't bring this general kind of claim. That, that sort of theory is more of a merits-y kind of theory, right? No. So I thought, again, that's a condition in the APA for the APA and 702, 5702, 5 U.S.C. 703 and 704 say APA review shall not be available when, um, and, and so it's yet another condition on the waiver of sovereign immunity of the government. It just says, it just says that, that, that APA review is, is a default provision if there is no other avenue for review. So if you've got, if you have a, if you have a special review statute in a, in an organic act, then that, then, then that is your, that is your remedy rather than an APA, rather than an APA remedy. Right. But these are all, are all arguments that you could make in the future. They're not, they're really not before us here. And that's, and I agree because we have an established standing. We really don't have to drill down on yet whether it's final agency action or not, whether they have another, a separate adequate remedy within the internal revenue code that forecloses APA review. Frankly, whether there, there's another problem with their, they're complaining about the internal administrative process for refund claims. Um, and I think my friend on the other side mentioned in Ray Cohen, the 2011 DC circuit case. If you look at that, I think it's worth looking at the sequel, the 2014 case where what happened was the IRS had a refund mechanism that in the 2011 DC circuit case was found to be susceptible to APA review. And what, what the IRS did was just retract that refund mechanism. They said, well, we're not going to have a refund procedure at all. You can bring your refund suits in court, which is what you're allowed to do under the statute. And, uh, the court, the DC circuit said, well, yeah, there's no, there's no entitlement to any sort of administrative review. Uh, so, so you know, the fact that they can retract it entirely and leave nothing to review, you know, um, also is, is it would be another problem for, for litigating the, uh, the contours of this internal administrative process. I think the one last thing I need to cut you off because you're way over your time. Thank you very much. Let's put two minutes on the clock for rebuttal, please. Thank you. I, I wanted to just start by, by identifying, uh, circling back to their addressability issue, which seems like it's a gating issue here. Um, and I wanted to point out, I didn't have this available to me before, but, um, you know, there was discussion from at the district court level and the district court's order at, um, page 19 of that court's order, which is page 20 in our record. And the court did note that, and we did provide data on ERC today's filings prior to the moratorium when this program was set in and afterwards and ERC today. The district court seems to have thought that you showed you were worse off, but I can't find anything that supports that. So we are an appellate court because sometimes district courts make mistakes. And if you want to rely on that, I'd love for you to point me to the underlying data. Well, I mean, it was an allegation in our verified complaint, which was, I believe, in pair of 34 of our complaints citing the, the data that ERC today saw it was, you know, they, they quoted, I think it was something like, um, you know, approval of, of several thousand claims before the moratorium, which dropped 75 after this program went into place. Right. But we don't know how many you have, you say it approved 7,000 before it approved 75 per week, whatever, without the denominator, we don't know how many that's out of. So we don't know if you're losing money or gaining money or anything from that allocation. Well, I want to, I mean, it's, I mean, there, there's a reason why the district court then went on to write that if it, if it took our pleadings at face value, it would have found redressability. And I don't know why it then went on one step further to speculate that we hadn't after it said that we had. Um, but I think it's, it also speaking to that issue is this, this issue of, are you better off before? Are you My counsel mentioned, um, I think he made a comment that what we're asking for is full audits prior. And that's the whole premise of why we're not worse off afterwards. And I want to clarify a point here. We're not stating, we're not saying that the IRS has to perform a full audit of these claims beforehand. And in fact, that's in the record that that doesn't happen. So I want to point you to what was Mr. Deputy Commissioner O'Donnell's declaration, which is in our record at ER 825. Um, and I think it's paragraph 55. He discusses a more streamlined procedure that they use prior to disallowance, which is again, it's one of the various ways the IRS processes these claims before disallowance that is not a full audit. They can also do what they call information document requests. There are ways they can reach out to the taxpayer, even in these high risk claims. And they can say, we just need some more information to verify. What are you even claiming here? What is, what are your gross receipts? That can skip the process of having to go to a full blown audit. But once you have a disallowance after a 105C, that's a hard stop. Now you have to have a full audit because now you have to, you basically have to treat this like a claim has been denied. And just for context, before this program went into effect, a 105C was basically used only for the clear cut situations. Like if somebody filed and they were outside the statute of limitations, the IRS would say, hard stop, you're disallowed. But now we have this sort of shoot first, ask questions later process where only after you have a actual, it's like in a criminal case, having a conviction first and then sending it to the police department for investigation. And I think it's, I think we're, we're sort of, you know, we're kidding ourselves if we don't think that that process is going to complicate things very significantly for the parties that have to go through the administrative process under that banner. Thank you. You're over your time. Thank you. Thank you both sides for the helpful arguments. This case is submitted.
judges: HAWKINS, BYBEE, FRIEDLAND